All rise. The only one to call the court in our division is now in session, the Honorable Justice Margaret S. McBride. There's more coming. How are you? Good morning. We apologize for the little late entry. So, everyone please be seated and we will call our only case that we have this morning. Kelly versus Kelly. All right, I'm going to ask the attorneys, I believe there will be three of you speaking, to step up and identify yourselves for the record and whom you are representing. So, why don't all three of you step up first and we'll have those introductions. Good morning, Your Honors. John Pavletich on behalf of Carol Kelly, the appellant in this matter. Good morning, Justices. My name is Patrick Ouimet, O-U-I-M-E-T. I represent Kim Ellen Chamberlain, one of the intervening attorneys. This is Ouimet, Mr. Pavletich, Your Honor. Pavletich, yes. Second name on the brief. Good morning. Good morning, Your Honor. Paul Stephanides, Your Honors. I represent the village of Oak Park. All right, Mr. Stephanides. All right. Now, how do we want to divide the time? Normally, I would say that we're going to give both sides 20. Mr. Pavletich, you will be speaking first. You'll be able to save some time for rebuttal. And then Mr. Ouimet and Mr. Stephanides, if I'm pronouncing it right. I apologize if I'm not. You can share that 20 minutes, all right? Yes. Your arguments seem to be somewhat overlapping. And so, however you want to divide the time. All right. So, Mr. Pavletich, you may remain. The other two gentlemen may take their seats. And with that, we will begin. Thank you, Your Honor. May it please the Court. Carol Kelly did not, in her 1994 marital settlement agreement, waive her right to payments pursuant to a 1987 federal court judgment against the village of Oak Park. While the marital settlement agreement specifically addressed Patrick's right to payments under the judgment, it did not specifically address Carol's right to payments. The circuit court erred by conflating Patrick's rights with Carol's rights, referring to them as a single undivided asset. But the judgment provided both Patrick and Carol separate rights to payments, and the marital settlement agreement only identified and addressed Patrick's right to payments. Because the marital settlement agreement did not address Carol's right to payments under the judgment, Carol did not waive that right, and this Court should reverse. In terms of the last GWES waiver test, I apologize, Carol did not waive for two reasons. One, the marital settlement agreement does not specifically identify Carol's right to payments under the judgment, and two, the marital settlement agreement does not specifically state that Carol waived any expectancy or beneficial interest in the judgment. First, while the marital settlement agreement specifically identifies Patrick's right to payments under the judgment, it does not specifically identify Carol's separate right to payments. It must do so because the judgment is not a unitary and indivisible asset giving rise to unitary and indivisible property interest. What cases do you rely on? Anything from Illinois for that terminology, unitary? That terminology is taken from the California cases, Your Honor, which we think are persuasive in this context. Burwell is the principal. But it was cited in an Illinois case. It has been cited in an Illinois case, correct. Well, isn't it enough that they mentioned that the settlement and that he was going to get payments, and isn't that enough to point out to us that there was some sort of specific asset? I don't think it's enough. I agree with Your Honor that the marital settlement agreement does reference the settlements of the lawsuit. But, again, under these cases that we rely on, we think the relevant property interest is not the entire contract, or in this instance the entire judgment, which we believe is the legally operative document here, but the individual rights derived from that contract. Well, most of the cases you do rely on are from the First District. They involve insurance policies or a land trust. They pretty much say that you can waive an expectancy so long as one is identified in the decree and that it's specifically waived. How do you reconcile that later case, Hebert v. Cunningham? I think, Your Honor, that case, you know, certainly goes against our position here. We rely on... Are you sure it does? We've relied on a state of Albrecht in our brief. Yes, and you relied on a number of Leahy and the cases cited in Leahy, and they all say pretty much what your position is, that, yes, there can be an expectancy. It can be waived, but it has to be specifically identified, and it has to then, in the waiver, the waiver has to be specific. Hebert has kind of changed, I would say, maybe the second prong a little bit when it said that this was such a broad, expansive waiver that it had to include everything. But the other case that you cited, the Third District case, actually goes back to all the other cases that say, no, it has to be specifically identified. And in this case, there is no identification in the waiver about these payments. Right, Your Honor. I appreciate that, and I think that is basically right. I think the earlier cases do rely on this kind of general proposition that general boilerplate waiver language is not enough, and then we see later in Hebert, what Your Honor is referencing, that maybe there is some tension created there in between the decisions. I still think the prior decisions that we rely on are good law, and we think that that principle applies in this case. Well, let me ask you this. These earlier cases, the insurance provisions, the land trust, in all of those, the deceased person had the ability to change the beneficiary. Is that the same here? No, it is not. Why not? And does that matter? Yes, Your Honor. So why not? First, here the legally operative document is a federal court judgment. And under the case law, and as the federal court pointed out in this case, but to be clear, did not rule, that federal court judgments cannot be modified absent court approval. The parties have to agree, and the court has to agree. And that's what we think is consequential, why it matters, that here the legally operative document is a federal court judgment and not an insurance contract or some of these other documents that we've seen fleshed out in the case law. That's why we think this case is different, and that's why we think that the fact that the judgment is not modifiable shows that really that Carol's interest is independent of Patrick's interest under the judgment, because Patrick did not have unilateral control over Carol's interest. But the federal judge sent this case over to the domestic relations division for that judge to determine whether she had waived that interest. You're not suggesting that she couldn't waive it. You're just suggesting that under the principles or the rule, the two-prong test, that the appellee here has not met that burden. That's correct, Your Honor. We do not dispute that expectancy or beneficial interest can be waived in a marital settlement agreement. We just believe that the two prongs of that test are not met here. The criteria for waiver is not met here. And did this, did the deceased here, I mean, the interest that he had was his structured settlement, but did he have any interest in what she was supposed to get if she outlived him? No. He wasn't going to get anything once he was dead, was he? No, Your Honor, and that's exactly our position, that he never had any right to that, to Carol's right to the payments, because it was not his right to begin with. His right to the payments existed during his lifetime, and Carol's existed upon his death. Did you characterize the benefits that were, the benefits in the decree provided that when he turned 50, and assuming they were both alive, he would then start drawing the one-year annual payment of, what, about $36,000, and for the first eight years under the decree, Carol would get 25% of that income, so to speak. And did you portray that to the court as a form of support for the children that she had custody over? We did, Your Honor. That's our view of the language. That's how we've portrayed it and characterized it, so to speak, in this litigation, is that the parties contemplated that it would become a part of his net income and it would be treated like the child support treatments were treated via the marital settlement agreement. But their position is that that was an indicator that she was giving up any interest she might have had later. And our response is she was only giving up any interest she might have had in his right to payments, but not her own right to payments, which, again, we view as separate and distinct rights under the marital settlement agreement. We've been discussing the two prongs of the last buzz waiver test, and I just want to make sure I clearly articulate the argument under both of those prongs and talk through that just very briefly. So, again, two reasons why a waiver did not occur here. One, the marital settlement agreement does not specifically identify Carol's right to payments under the adjudgment. The first prong is that the asset must be identified and awarded as a marital asset to one spouse. Second, the agreement does not specifically state that Carol waived any expectancy or beneficial interest in the judgment. So on that first prong, again, we think that while the agreement specifically identifies Patrick's right to payments, it does not identify Carol's separate right to payments. Oh, one other thing I want to mention. Yes, please. Those payments that Carol was to receive once he started getting the 25%, those children were not emancipated for those entire eight years, were they? No. Maybe at the latter portion of those. I can't remember the exact, but they were still. Well, in 94 is when the decree was entered. The children were born in 85 and 88. So I'm fairly certain that through that eight-year period, they were still unemancipated or would have been minors. I could be wrong. I'm not certain. No, I think that's basically right, Your Honor, and that's consistent with our argument. I just wanted to be sure about the math there in my addition. The second point under the waiver test is that the agreement specifically states that Carol only waived an interest in Patrick's right to payments under the judgment and not in her own right to payments. So, again, we think for those two reasons, while as a general matter, a waiver could have occurred, it did not occur here under either of those two prongs. At this point, I'd be happy to answer any other questions from the bench. Well, the provision that says that each one of them is to maintain their own pension, how does that help or not help you? Is this a pension or is it something else? I think it's something else, again, Your Honor, and I really do think that. Well, she had a pension, didn't she, Carol, some sort of pension? I would have to check to be sure, Your Honor. I think she did, but I hesitate to answer definitively. Okay. Well, it's not called a pension in the federal court. It was really a structured settlement in a retaliatory discharge case, wasn't it? Yes, Your Honor, and, again, we really do think that, and I want to emphasize and highlight, which I think we are doing, that the really unique feature of this case and what takes it apart from some of these other cases is that the document here is a federal court judgment. And it is unique and distinct from, I think, a pension plan or a contract that provides for pension benefits because those ordinarily can be modified. Well, this could have been modified. It's just that it couldn't be done unilaterally. Right. The deceased could have gone into the federal court and specifically asked to change the terms of that. There probably would have been a big fight about it. But, you know, the federal court could have granted the change. It would have been the village and Patrick Kelly, they both would have had to participate in changing this. And, of course, getting the court's approval. Right. And the only thing I would add there, Your Honor, is there was another co-plaintiff that brought this civil rights lawsuit, Ronald Sermon, so he too would have had to agree with Mr. Kelly, with the village, and with the court. Well, I'm not so sure about that, but I do think that there would have had to be an overture or presentation to the court that this particular plaintiff wanted to change. Right, Your Honor. And just to clarify, so it could be modified, and I suppose what I was getting at is it cannot be modified unilaterally. And I think in some of these other contexts, like the pension context, for instance, it's my understanding that some of those plans can be modified unilaterally, and we think that's a critical, significant distinction here. Anything further? Nothing from me, but as I say, I'm happy to answer any other questions from the court. All right. Well, I don't think there are any questions at this time, and you'll have some time for rebuttal. Thank you, Your Honor. Sir Ouimet. Thank you again. Again, my name is Patrick Ouimet. I represent the intervening appellee, Kim Ellen Chamberlain, in this case. The issue presented to this court is specifically whether or not Ms. Kelly waived her expectancy interest, which was a beneficiary in the 1987 settlement agreement between Mr. Kelly and Mr. Sermon in the village of Oak Park. Was this payment, was it about $36,000 annually? It was $30,605 annually, Your Honor. Okay. And what did she give up, or what did she get, rather, in the decree to justify giving up $30,000 plus every year if she outlived her former husband? In the decree, both parties, Patrick and Carol, specified the marital assets that each of them had acquired during the marriage. And Ms. Kelly received the marital residence. He got a residence, too? I believe he was living with his mother at the time. Okay. I thought the decree provided for him getting possession of something. I could be wrong. But she was given custody of the children, so they were going to be living with her in that marital home, previous marital home. That is correct. Okay. So the parties to this agreement expressly, their intent was divide the marital assets. Your question, Justice McBride, is what did Carol get out of this? Yeah, what did she get? Patrick and Carol agreed to distribute 25% of the net payments for eight years of the asset. Now, that's significant because that correlates to the marital portion. Doesn't that correlate to support for two minor children, that they would get a percentage of his income would go to their support? Ms. Kelly's argument says that that exchange was intended for future child support. There was no indication in the language of the MSA itself that says so. What was the support payments that were ordered in the decree? The support payments were, at that time, Mr. Kelly was, I believe, an assistant state's attorney, and 25% of his biweekly income were for child support. Right. And there wouldn't be anything unusual or uncommon about if a person's income increased, that the parties would agree that that 25% would go towards the support of those children. Is there anything unusual about that? There is nothing unusual about that, Justice McBride, except this. They did not state that in the MSA. They could have easily put in the maintenance provision that so long as, until the year 2001, when you begin receiving these additional payments, your child support payments will increase until such time as the age of maturity. Let's talk about what is the actual disputed asset here. Is the disputed asset his entitlement to structured settlement payments, or is it her payments that she gets if he's dead? What asset does he have in those payments? He has no interest in something she would get if she outlives him. And that is true if, based on an assumption, and that assumption is that the contractual right, as Ms. Kelly argues, her contractual right to the payment of the death penalty. I think she calls it an expectancy. I hope she does. Well, I don't know. Whatever we call it. What Ms. Kelly is trying to do is divide up what is the marital asset and the distinction between interest in a marital asset. The marital asset here, to answer your question directly. The disputed asset. The cases don't talk about the marital asset per se. They talk about the disputed asset. And my question to you is, is you're saying that his structured settlement is the disputed asset, when, in fact, he has absolutely no right to anything once he dies. So how does he have any interest in this, whatever you want to call it, expectancy, her getting paid a percentage of that settlement? I mean, I'm not sure. I don't understand how the disputed asset is something that he had with the village. Well, the disputed asset in the cases that this Court has decided and in other districts in Illinois are, for example, the pension itself. That is the asset that is in dispute. Now, that pension has two components, the pensioner's payments and generally a death benefit, maybe a surviving spouse annuity or death benefit. But in each of the cases, for example, in Hebert versus Cunningham. Hebert, yeah. Let's talk about Hebert. Okay. Hebert was a 401k case. That is the asset in dispute, yes. But there were multiple 401ks. The wife had, I think, more than one 401k. The husband had more than one. His was specifically identified with the bank. And in that case, the Court pointed out that the asset, the disputed asset, his 401k was mentioned not only in the decree, but it was specified. Where do we have it specified in this case? It says his payments, his payments. That's all it says. Couldn't it have been easily included if she was going to be giving up 30,000-plus every year? Why isn't that mentioned at all? It talks about the payments he's going to get when he turns 50. To answer your question. that she would be this expectancy that she might get. Isn't that the disputed asset here? Not what his payments were in his lifetime. He's not trying to get any of those payments. He's trying to get something that she would get, an expectancy, whatever you want to call it, if she survived him. That is correct. And to answer directly your question, you ask, where in the MSA is this disputed asset mentioned? It's never mentioned her payments that she would get if she outlived him. There's not a word about it. Your Honor, I would respectfully state that in paragraph 8 of the MSA, the parties specifically identified the Federal Settlement Agreement as an asset in the personal property section. What they identify is what he's going to get when he turns 50. They don't mention anything about the other payments. Or the children. The children are mentioned in that structure settlement, aren't they?  But the muralist... We're not really talking about them. But in that paragraph, I mean, I can read it to you. It says, the husband is to receive payments. Yeah, he is. When he turns 50, he's to receive payments. And then it says, when the husband receives such payments, she'll be entitled to part of that for the first 96 months, when those kids are still not even able to support themselves. So where is it, her payments, the ones that she gets if she outlives him? Where is that identified here? It is not identified in Section 8. It's identified in the expectancy interest. It's identified in paragraph 13, which is late. Okay, let's look at 13. What does it say? Are you talking? Well, paragraph 9 is about the pension benefits. And then it says, 13 is the waiver provision. That is correct, Your Honor. Okay. So that's a pretty broad general waiver, right? It is not a general waiver.      It's a general waiver. It's a general waiver. It's a general waiver. It's a general waiver in the sense that the Heber court and the Rosen court had characterized broad waivers. But that characterization by the courts, the first district public court here, is in the context, is that what was the intent of the parties? Is that broad waiver encompassing? Go ahead, I'm sorry. Does that broad waiver encompass present and future property interest? And in both cases, the court said it did because of the broad nature. But it's not, to distinguish some of the other cases, it's not a general waiver. Well, what is required? A specific waiver or a general? What about all the cases that were before Heber and all the cases that Leahy cited? I'm glad you mentioned that. The judge in the domestic relations court, he doesn't talk about them at all, does he? Not a single word about any of those cases. No. Did he ignore them or was he not concerned with all of them? Because this is kind of what they say, that the asset in dispute must be specifically listed in the agreement and awarded to one spouse. And second, the release language must encompass the waiver of any expectancy or beneficial interest in the asset on the part of the spouse. Now, that's all of those cases. That's what they said. Not only does it have to be specifically listed, but then the waiver has to specifically address that disputed asset. And that is entirely correct. Often in the in-ring marriage of Velazquez, where that element of the test comes in, that the marital asset in dispute must be expressly identified and waived in the waiver clause. Even in the in-ring marriage of Velazquez, the marital asset itself was not mentioned in the waiver clause, in that case, nor was the specific distinct property interest of the parties mentioned. Lynn, I don't know if that case is very persuasive for you. If it's not really following the longstanding precedent that I just described, that said the disputed asset has to be mentioned. We've already conceded that this really wasn't mentioned, that the disputed asset, her right to payments, is not ever mentioned in this decree. Well, I have not conceded that the asset itself is not mentioned. Okay. But I have not conceded that the law in Illinois requires that the marital asset in dispute must be, again, listed in the waiver provision. In Velazquez case, the Hebert case, the Robeson case. But how was this asset described, other than the words, his payments? I mean, how are you reconciling the fact that this doesn't refer to the payments that she would get, this expectancy or whatever you want to call it, if she outlived him? This is talking about his payments in a structured settlement that he was to receive. There's no mention of her or any payments or anything else. It's all about him, his payments. I'm not sure I understand how you're saying that now the asset that's in dispute is actually specifically provided for in the decree. Well, for example, if I may go back to paragraph 8, it states during the course of the marriage the husband settled a certain lawsuit. Right. In reference to his employment with the Village of Oak Park Police Department. Right. That is the settlement agreement is the asset in dispute. And if I go back to Hebert, and you were analogizing the 401K with fidelity. Yeah. Even in that case, all that was mentioned in the marital asset portion, the first leg or the first column of the Velazquez, was the 401K with fidelity. No, it mentioned every single 401K and retirement plans like an IRA that both spouses had, and it specifically identified the one with the bank that he had, and then that provision specifically said that each one is giving to the other those 401Ks without any dispute of any kind. That was the identifying provision. The waiver provision that said, well, this is so broad, it obviously has to encompass everything, is not really specifically directed to the 401Ks, and the court still found that it was enough. But in that case, those 401Ks were specifically identified. There's no mention of her payments at all. And you keep saying that the structured settlement was the disputed asset. Well, really, the disputed asset was her right to some payments if she outlived him, not his payments that he was going to get while he was alive. That's what those payments are. So I'm still troubled with the idea that the asset is not described. This is what he would get after he turned 50. That's all that's mentioned. Now, couldn't it have been included? Couldn't there have been some mention of this if she was giving up a $30,000 expectancy, if she outlived him? I don't understand why it couldn't have easily have been inserted. That argument was brought up in the Velazquez case also, that could not the disputed marital asset also have been listed in the marital settlement agreement. And the court said it would be better, of course, it would have been better if, with precision, the lawyers, when drafting a marital settlement agreement, specified each and every interest in the marital asset, as well as the marital asset, in both the first prong and the second prong of the Velazquez waiver text. But the Velazquez court, which is relied upon by Heber and subsequent and before that the Ropeson court, states that it's not necessary to be that precise. As long as the intent of the parties is demonstrated, did these parties intend to list the marital asset, which was the federal settlement agreement, or federal judgment, as listed? Well, then how do you distinguish every other case that the trial judge never mentioned? In re estate of Albright, Leahy, In re the marriage of Myers, Aetna Life Insurance, O'Toole, all of those cases, how do you distinguish them? I would distinguish them exactly as the Heber case distinguished them. Each of those cases, except for the estate of Albright, are pre in re marriage of Velazquez cases. And then secondly, to distinguish is then to talk about the estate of Albright. I think that the estate of Albright actually supports our position. It's cited by Ms. Kelly. But it supports our position because, again, the first prong of the estate of Albright case, which dealt with the pension and annuity and, I believe, a MetLife insurance policy, in that all that was mentioned as the marital asset was not the interest in the beneficial interest in the asset, but the asset itself, just like ours. And the distinction on the waiver end in the estate of Albright case, on the waiver end, the court, if I may read from the opinion, the court said in both cases the insurance policy, death benefit, and the surviving spouse annuity failed the waiver because the asset was not. Specifically? Paragraph Q, however, does not specify waiver of Sherrill's expectancy interest as required by the first, the step two of the Velazquez test. None of the provisions, and this is the life insurance part of it, none of the provisions in the judgment of dissolution expressly waive Sherrill's expectancy interest or even mention it. Our amendment on the surviving spouse annuity, the court wrote, that the judgment of dissolution does not specify the surviving spouse annuity or include an express waiver of Sherrill's expectancy interest. Now, in this case, there is an express waiver of Ms. Kelly's expectancy interest in the marital asset. Her expectancy interest is she was a contingent beneficiary of a death benefit. Nothing unlike a beneficiary of a life insurance policy or a beneficiary of a surviving spouse annuity or a beneficiary of the land trust. It's an expectancy interest. It was not a vested property right. She owned nothing at the time she was divorced. We know that you can give up an expectancy. It's the waiver. It's the two-prong test. Why don't you kind of wrap it up because we still have to hear from Mr. Stephanides. I think you've explained yourself and we understand what's in your brief, but let's give him a little time. I'm sorry. Thank you. Wait, wait, wait. I have a question. Sure. Yes, Justice Breyer. You would agree that our job here is to determine the intention of the parties? I would agree. Certainly. Okay. Now, how do you get around the Leahy case? I find that to be very instructive. As the Hebert Court decided, because that was one of the, in the Hebert case, the opponent cited Leahy, and I believe O'Toole also was cited, and the Hebert Court simply said those cases are distinguishable because they predate the Velazquez waiver test. They're not applicable anymore. The controlling case law today, at least for sure in the First District, is Hebert ropes in and it follows Velazquez. And those cases distinguish the Leahy, the pre-1990 Velazquez cases. I don't think the test changed at all. I think Leahy has the test set out like every other case before it. The waiver requires that the asset, the disputed asset, be identified, and then that the waiver has to specifically waive that particular asset. I don't think there was a change in the test. If that's how Velazquez interpreted Leahy and all the other cases, I don't agree. I think the test has been there forever. And I think that the Third District in what's that case that was written? Albrecht. I don't think the test ever changed. I really don't. I think it was always the same, that you can give up an expectancy. It's long been held you can do that. But you have to point that out. It has to be specific. It has to be identified, the disputed asset, and then the waiver has to also specifically waive it. It's not supposed to be just, oh, just make it as broad as possible, and then you've met the test. With all due respect to Justice McBride, Velazquez does not state that the marital asset itself has to be restated in the waiver provision of the asset. And I'm not saying that. I'm just saying that the waiver has to specifically talk about the asset. And I don't think that a general waiver does that. But in any event, even if you met the second test, the question still remains, how is this identified? You said it's identified because they referred to a lawsuit. So but let's – I think that Justice Gordon asked you how do you distinguish Laney, and you said, well, Velazquez distinguished Laney and said it was no longer the test, so. But I think the test has always been the same. And I agree with you. I certainly agree with you. It is a two-pronged test. And what I was referring to was even Velazquez stated, that announced the two-pronged test, stated that you do not have to restate the marital asset in dispute, nor the property interest of each party held. No, and I think that's fair. I think that's fair. And if – But I still think you have to identify it. And I don't know what she was – what did she get?  Well, thank you, Your Honor. I think you kind of take the same positions. Sort of. Thank you, Justice. That's correct, Your Honor. May it please the Counsel, Paul Steffi is the village attorney for Oak Park, and I represent the village in this matter. Yes, that is correct. We are in basic agreement with the arguments of Kim Ellen Chamberlain in this matter. Why would you have a position on this? Why would you have any position on which spouse gets this pension? That makes no sense to me. Why would a municipality care? Well, Judge Kennelly had an interesting point on that in the federal court case. He said it is very possible that the village will have to pay nobody going forward in this matter with his ruling that Carol Kelly is the present wife, and with this marital settlement agreement that's been reached between Carol Kelly and Patrick Kelly. That's why we care. So you think there's a better opportunity for Oak Park not to have to pay anything? Well, Judge Kennelly basically said that. There is this door that's been opened. Well, going to what Justice Burke has asked you. Yes. Under the judge's decision in the Domestic Relations Court, Ms. Chamberlain doesn't get payments. Right. So really, that's your position, right? You don't want to pay anybody. Representing the, as I said, legal obligation to do, seriously represent my client to vote for Oak Park in this matter, yes, there is that case. Let's assume we would affirm the circuit court judge. Yes. Ms. Chamberlain doesn't get anything. Right. Okay, so that, I mean, she's not getting anything under the circuit court's ruling, right? Right. And the federal court judgment cannot be modified unilaterally. Yes. And the judge, that decision was not appealed to the circuit court of appeals, was it, to the federal? No, it was not. So that's decided. Yes. So in other words, yes, to answer your question, then the village would have met its obligation under the settlement agreement, the judgment in the federal court case, to make the payments to Patrick Kelly over his lifetime. And the village did so. The village made, I have the numbers here, 28 payments to Mr. Kelly beginning in 1988 through 2016 in the amount of $30,685.03. So that's what it would mean, that the village met its obligation to make those payments, and the village's obligation ceases. So that's what Lioness and his worker. What did Carol Kelly give up? I mean, why would she give up this $30,000 and it not be mentioned at all in the decree? And what did she get in exchange for giving up this, not a pension, because it's a structured settlement for a personal injury lawsuit. What was she giving up? Why did she give up this? What did she get in exchange? Well, all I can argue with that is what the settlement, the marital settlement agreement provides, Section 8. I'll just quote from the language. This being the intent of the parties. During the course of the marriage, the husband settled a certain lawsuit in reference to his employment with the Village of Oak Park Police Department. So there's the identification that Judge Link relied upon in the circuit court in this case. The husband has received payments in the same manner as the Village of Oak Park, pays pension benefits to former employees. And then this is which. Did they all pay him annually once a year? Is that what it was? Yes, that's what it was. Okay. It's the only way you could call it that is because they were doing it on a lump sum payment once a year. Every November he got $30,000. Exactly. Six plus. Yes. Whatever. He and another officer. So for her to give that up, if she outlives him, what did she get in return? Where is there any intent in this divorce decree that she was giving that up? Well, it is listed under personal property and she's getting. What do you mean personal property? It's not a pension. It's listed under personal property of the parties in the divorce decree. Well, yes, but she didn't have any right to those payments when he turned 50, except for this 25% that would be likely or was obviously support for children that were not emancipated. What did she get to warrant saying she gave up this other thing? She got upfront payments, so 25% of the net payment received by the husband for the first 96 months. And you don't think that was for the kids? It doesn't say. Okay, it doesn't say. It doesn't say. So where does it define that that was how she was giving up $30,000 for the rest of her life if she outlives him? Well, we have to find the intent, like Justice Gordon said. Under the four corners of the marital settlement agreement, that's the intent. And the Herbert case. How are his payments that she didn't really have a right to, how is that describing the pension? I keep calling it that, but it's not a pension. It was a structured settlement as a result of a retaliatory discharge lawsuit, wasn't it? A constructive discharge. So in the settlement agreement reached between the two officers, they agreed to resign, and then they got these payments. I believe they were both close to their 50th birthday, and so that's why they were referred to as similar to pension payments, but they weren't. You're right. You're correct, Your Honor. So then that other provision about pensions, each one gets to keep their own pension. He didn't have a pension. With the village of Oak Park. Right. That's correct. Okay. Well. I don't know what he had with the future payments. I don't know if he had any other pension. Yeah, I don't know either. Either here or there. Right. But that provision doesn't really add anything to this discussion, do you think? I think it does. The personal property. No, I mean the pension provision, that they each keep their own pensions. Oh, I see. I would agree with that, yes. So what I wanted to reiterate is the village did meet its obligations under the federal court lawsuit brought by Patrick Kelly. The village made the payments that it was obligated to make throughout his lifetime until his death, and as Judge Link pointed out, it was Patrick Kelly's lawsuit against the village of Oak Park, that federal court lawsuit. It wasn't Carol Kelly's, and it was also Ronald Sermon's. Mr. Kelly, the village, and Mr. Sermon entered into an agreement in the federal lawsuit that the payments would be made by the village to them until their death and then to their present wife. We have Judge Link finding that there is the waiver of the expectancy interest by Carol Kelly. So it's your position that if we affirm the trial judge that Ms. Chamberlain doesn't get any payments. Isn't that correct? That's correct, because the federal court has found that the present wife means Carol Kelly. Carol Kelly's interest was dependent on Mr. Kelly's interest. At the time of her divorce in 1994, she had no contractual right to these payments that we're arguing about here today. She could not sue the village in 1994 for payments, nor can she do so now. The parties could have, as you pointed out earlier, the parties to that federal court lawsuit could have amended the settlement agreement. It can't be done now. That's correct. But if there was a meeting of the minds, there could have been an amendment to that agreement. Summing it up, explain to me again what did Ms. Kelly get in exchange for giving up these payments that aren't really described anywhere? His payments are not her payments. She would agree with that, wouldn't she? His payments are not her payments. Yes. Okay. Okay. Right. So what did she get from that? To give up her own payments that were in this federal structured settlement. What did she get in this domestic relations case? Well, Justice, I have to come back to what I said previously. Paragraph 8 of the marital settlement agreement provides that she got those upfront payments, 25 percent of the net payment received by the husband for the first 96 months of the marriage. And you don't think that had anything to do with just a traditional support for children of the marriage? It's listed in the personal property section. And it mentions there's no language about support to the children. To sum up the villagers' argument. But there was a provision for support in the decree. It's in a different provision. Different section. And what did that say? That 25 percent of his income is supposed to go towards their? Okay. I see. And it just happens to be the same number that she was going to get once he turned 50. And all those, and the children were minors, you would agree, during that eight-year period, weren't they? Yes, yes. Carol Kelly argues in her reply brief that it would be an absurd result for this, to reach the conclusion that the villagers' obligation ceases after it made its payments to Patrick Kelly. And our argument is it's not an absurd result. It is the result that is required here under the law. That those made those payments for that 28-year period in the amounts that it was obligated under law. Did the trial judge discuss any of the previous cases? Lady, Henry, the marriage of? Anyway. He relied on Herbert. Hebert. The parties keep misspelling it. It's not Herbert. It's not Herbert. Hebert. Excuse me. Thank you. It's just Hebert. He relied on Hebert and the broad language that was upheld in Hebert and Velazquez. Well, do you think that the case law has changed and that there's no requirement that in the waiver provision that it be more specific than general? Well, the waiver provision itself, the language under Hebert, I'm looking at the Hebert decision here. We found that the divorce decree's waiver provision is unambiguously broad in perspective. So that's the same language we have here. We have a broad language. And then we have an identification. So I agree with Your Honor. The law hasn't changed and Hebert does apply. And as Judge Link correctly ruled, Hebert is to be, he followed Hebert. The court were to follow Hebert. Judge Link's decision would be upheld. All right. All right. Thank you very much. Thank you for your time. Mr. Kablatik, a brief follow-up. Yes, Your Honor. I'll be brief. Just a few points. First on Leahy and this line of precedent that predates Velazquez, I'm not aware of any rule or principle that precedent is, can be informally overruled sub salentio in a decision. And Velazquez and Hebert do not say that they're overruling those prior decisions. I think the test is the same. And the animating principle of the test is that the asset must be specifically identified and awarded to a spouse, and it must, the interest in that asset must be specifically waived. And we think here, and that's why I'm going to go to the text of the marital settlement agreement, which is what we've been discussing, the text is not specific and explicit enough. So paragraph 8, personal property. My friends on the other side have been reading this first sentence about the settlement of the lawsuit. But the second sentence, which I think the presiding justice hit on earlier, says the husband is to receive payments in the same manner as the village of Oak Park pays pension benefits to former employees. When the husband receives such payments, the wife shall be entitled to 25 percent of the net payment received by the husband for the first 96 months of the payments. The language is specific to Patrick's right to the payments, not Carol's right to the payments. And then I want to move on to the second prong, paragraph 13 of the agreement, the mutual releases, and point out the language here. So the mutual releases section only waives a right or interest that a spouse holds as husband and wife by reason of the marital relationship into or against the property and assets of the other. So we think there are those kind of two prongs there, by reason of the marital relationship, as we've argued in the briefs. Carol's right did not exist by reason of the marital relationship. It existed by reason of the federal judgment, which awarded her that interest as the present wife. And then second, the second portion of the language, into or against the property and assets of the other, this was never Patrick's property to begin with. It was always Carol's property. I think you should refine this comment. You're saying that the asset or the right for her to receive the payments, if she outlived him, did not arise out of the marriage. You know, what do you mean by that? So I'm hitting on the language in this mutual release section, by reason of the marital relationship, which I think defines the scope of the waiver. And the argument that I'm trying to convey to the court is that her interest did not exist by reason of the marital relationship. Well, what did it exist by reason of? By reason of the federal judgment, which awarded her that right, that interest. That was the legally operative document that conveyed that interest to her. And we cited some cases, no cases from Illinois to that effect in our brief from other jurisdictions. Just a couple other points, you know, in response to some of these questions, and I think what this text of the marital settlement agreement makes clear, Carol gave up nothing. She got nothing in return for this. They're saying that the intent is clear because she was to receive eight years' worth, 25%, for eight years of that, those payments that he was getting once he turned 50. They're saying that's what she got, that that was the intent of the parties, that this was in exchange for her getting anything after, if she outlived him. And the reply, Your Honor, is that only applies to his payments, not to her own payments, which, again, are separate and distinct under the marital settlement agreement. And I think that's what the language of the agreement does. So why isn't the disputed asset this federal decision, this federal judgment? Because I think as some of these cases have shown, it is not the entire, you know, legally operative document. Here, the judgment that is the asset in dispute, but the individual rights derived from that document, from that contract are here, the judgment that defines the asset in dispute. So that's why we argue, and that's the difference between the parties here, we argue the asset in dispute is Carol's interest, Carol's interest right to payments, not the judgment as a whole, but Carol's specific right to payments. The last point I want to make to Your Honor is the practical effect of the circuit court's ruling and this court's ruling should it affirm, it was touched on in Oak Park's argument, but the circuit court found that if this court affirms that argument, that likely means that nobody will get paid. And at the beginning of this litigation, when we were in federal court, Oak Park took no position on who should get paid. Well, this kind of raises another question to me, and that is, how can Ms. Chamberlain be here if we affirm the decision of the circuit court, what relief could we possibly give her? Isn't her appeal basically moot based on if we were to affirm the decision of the circuit court, she doesn't get anything. So how is she actually here? What relief could we possibly give her? My understanding is that … She didn't get anything over there. Right, but Judge Canelli, the federal court asked the parties to come to the domestic relations division and seek out a ruling on this waiver question. He abstained from ruling on the waiver because he wanted to defer to the state court on that question. So my sense is that the relief Ms. Chamberlain wanted is a finding of waiver. And then she can go back to the federal judge and say, Judge Canelli, the state court, we did what you asked us to. The state court said Carol Kelly waived. And I imagine … But he's already concluded that the only one entitled to any payments under that settlement was the present wife. And he concluded that the present wife was Carol Kelly. And that decision was never appealed to the Seventh Circuit Court of Appeals. And, therefore, Canelli can't do anything with anything. I have to think about it, Your Honor. I'm not sure Judge Canelli's ruling was a final judgment. It was, because if you don't appeal it, it is. That decision that she was the present wife raised judicata. Right. And, again, I imagine if affirmance is the ruling here, Ms. Chamberlain … So she does not get any relief, so to speak. She gets the waiver finding. And she goes back to Judge Canelli and says, Judge Canelli … Well, I'm trying to figure out what relief could possibly be given to her. Why isn't her whole appeal moot? I don't have … I think the relief is … Let me ask you this. Patrick Kelly is deceased. The structured settlement was between him and the village of Oak Park. There's absolutely no way that anyone other than Kelly could have gone in and had that settlement agreement changed. Isn't that correct? That's certainly our position, Your Honor. And I think what we've argued and what Judge Canelli has signaled, perhaps a preview of coming attractions, but I do not think has formally definitively ruled yet, is that the judgment could not be modified absent court approval and agreement of the parties. I think Ms. Chamberlain is going to and has made an argument against that, but I think that's an uphill battle for her. So on this point, just to conclude briefly, like I said, Oak Park took no position at the beginning of this litigation, at the beginning of this lawsuit. It was only until Oak Park figured out that it could get out of this without having to pay anyone that it took the position that Carol waived. And in our view, that's expedient opportunism, and it provides a windfall to Oak Park where nobody gets paid, and the court should be mindful of that when it decides this appeal. Some might say that to advocacy counsel. Yes, and as counsel argued, and I take no issue with him doing what he feels is best for his client. But obviously, the position has changed, and I'm just highlighting that for the court. Thank you. All right. Thank you very much. Thank you all. The case was well-argued, well-briefed, and certainly a very interesting case with significant issues, and it will be taken under advisement. Thank you all. Court is adjourned.